UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v.    ) <br> ) <br> 6. JAMES CARNES,    ) <br> ) <br> Defendant    ) | No. 20-cr-10164-NMG |

## GOVERNMENT'S SENTENCING MEMORANDUM

For the reasons stated below, the government respectfully requests that the Court sentence the defendant to time served (one day) followed by three years of supervised release, a fine within the guidelines sentencing range (unless the court finds he cannot pay), restitution of $20,106, and a $200 special assessment.

## FACTS

### Background – James Carnes

James Carnes ("Carnes") became a Boston Police officer in 1989. He worked as a patrol officer in the South Boston/Dorchester District for 17 years, From 2006 through 2016, Carnes worked on the crime scene response unit. From July 2016 through 2019, Carnes was a patrol officer assigned to the Evidence Warehouse. PSR, ¶7.

### The Evidence Warehouse

The Boston Police Department leases two buildings located at 1555 Hyde Park Avenue in Hyde Park which serve as the Boston Police Evidence Warehouse. Sworn police officers assigned to the warehouse, which include approximately ten members of the Evidence Control

1

Unit ("ECU") work from 7:30 a.m. to 4:00 p.m. Mondays through Fridays. The members of the ECU include a Lieutenant or Captain, two Sergeants, and five or more police officers.

The members of the ECU control access to the warehouse and their duties include: storing and cataloging new evidence, including drug evidence, retrieving evidence for use in court, and transporting the evidence when necessary.

## Purge Overtime

In or around 2011, the ECU ran out of space for new evidence. The BPD consequently approved a program called "purge overtime," which allowed ECU officers to work an overtime shift to dispose of old and unneeded evidence, organize the evidence at the warehouse more efficiently, scan older evidence into newer computer systems so that it can be tracked more effectively, and thereby create space for the intake of new evidence. This purge overtime shift ran from 4 p.m. to 8 p.m., most often Monday through Thursday, and was performed by four or more ECU line officers (patrolmen/patrolwomen) and one or more supervisors (either a sergeant, lieutenant, or captain). Because purge overtime followed the officers' regular shift, it was paid on an hour-for-hour basis, in 15-minute increments. Additionally, because purge overtime required officers to manually sort evidence, purge overtime could not be performed remotely.

Overtime hours are reported using an overtime slip, an example of which is shown below, which requires officers to state their name, overtime purpose, start time, end time, and actual hours worked. The overtime slips must be signed by the employee working overtime as well as the supervisor and commander, and an overtime slip must be submitted for each and every overtime shift. Notably, BPD's overtime slip—in bold and underline—asks BPD employees to list the "Actual Hours Worked" for each overtime shift:

[Boston Police Overtime Authorization/Record form for CARNES HAMLTS, ID 10393, showing "PURGE" overtime purpose at "ECU" location, start time 16:00, end time 20:00, actual hours worked 04:00, start date 05/17/2018.]

On this particular day, May 17, 2018, Carnes (along with others performing the "purge" overtime) is representing that he worked 4–8 p.m. (1600-2000), in the warehouse "ECU," and that he "actually worked" 4 hours of overtime. Contrary to what was represented in this overtime slip, the alarm records show that Carnes and the other officers left at 5:57 p.m. PSR, ¶19.

## BPD Warehouse Alarms

The BPD Warehouse is extensively alarmed, with alarms on each outer door, separate alarms on various trailers and safes within the building, and, internal motion sensors. Once the perimeter alarm is set, any person inside the building would either trigger the motion sensors, or, would have to disarm the alarm in order to exit the building. Data from the alarm system, including when it was set and disarmed on a given date, and by whom, was maintained by the City of Boston.

## The Criminal Conspiracy

From at least January 2015 through in or about February 2019, Carnes and co-

3

conspirators conspired to be paid for hours they did not work by submitting false and fraudulent overtime slips in which they claimed to have worked a full "purge" overtime shift when in fact they did not.  Supervisors in the ECU, such as Captain Richard Evans, Timothy Torigian, and Sergeants George Finch, Robert Twitchell, and Gerard O'Brien, routinely agreed to endorse overtime slips for themselves and their subordinates certifying that they and their subordinates had worked a full four hour "purge" shift when the supervisors knew that they had not done so. PSR, ¶18-20.[1]

From at least July 2016 through February 2019, which is the relevant time period in which Carnes was assigned to the Warehouse, Carnes and the officers of the ECU submitted hundreds of false and fraudulent overtime slips in which they claimed to have worked a full four hour "purge" shift, despite the fact that the Warehouse perimeter alarm was set well before the end of the shift.  Though supervisors knew that these overtime slips were false and fraudulent, supervisors endorsed the false and fraudulent overtime slips. PSR, ¶18-20

## Government's Loss Calculation

The loss attributed to individual officers was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working.[2]  During the conspiracy, spanning from at least January 2015 through February 2019, the members of the conspiracy were paid over $386,000 for hours that were not worked.  Based upon a comparison of the overtime hours claimed versus the time that the building alarm was set, from at least July 2016 through February 2019, Carnes personally received approximately

---

[1] Lieutenant Torigian, Sgt Twitchell, and two other charged officers were acquitted after trial.

[2] This methodology was laid out in testimony before this Court, and in a second trial. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65.

$20,106 for overtime hours that he did not work. PSR, ¶24. During the tenure of Carnes from July 2016 through February 2019, the members of the conspiracy received approximately $249,138 for overtime hours that they did not work. PSR, ¶25.

## **Advisory Sentencing Guidelines**

### A.    Government's Calculation

The government's position with respect to the Sentencing Guidelines is as follows:

a) Defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of less than 20 years (USSG § 2B1.1(a)(2));
b) Defendant's offense level is increased by 10, because the reasonably foreseeable loss is greater than $150,000 but less than $250,000 (USSG § 2B1.1(b)(1)(F));
c) Defendant's offense level is increased by 2, because defendant abused a position of trust, (USSG § 3B1.3);
d) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes, and has timely notified authorities of his intention to plead guilty thereby permitting the government and the Court to allocate their resources efficiently (USSG § 3E1.1); and
e) Defendant's offense level is further reduced by two levels because he is a zero point offender. (USSG § 4C1.1).[3]

The government has calculated the total offense level to be 13. Carnes' criminal history category is I, which results in a GSR of 18-24 months' imprisonment.

### B.    Probation's Calculation

Probation's calculation differs from the government's in one material respect. PSR, ¶¶37, and Objections, p. 30-31. Probation has concluded that the entirety of the loss during Carnes' tenure cannot be attributed to him. Instead, Carnes could only reasonably foresee fraud of co-conspirators occurring on days when Carnes actually worked, and left early from, a purge shift.

---

[3] The government's plea agreement predates the adoption of the "zero point" Guideline, USSG §4C1.1. The government agrees with Probation that Carnes should benefit from that Guideline.

PSR, Objections, p. 30-31.  The total amount of loss attributable to Carnes for losses incurred during shifts that Carnes, himself, worked, has been calculated to be $145,762.

Probation has calculated the total offense level to be 11.  Carnes' criminal history category is I, which results in a GSR of 8-14 months' imprisonment.  PSR, ¶90.

### C. Restitution

The defendant and government object to any award of restitution beyond $20,106.

## ARGUMENT

### I. Guidelines Calculations

#### A. Loss Amount

The government believes that a loss amount of $249,138 (out of the total conspiracy wide loss of $386,766) is appropriately attributed to Carnes based upon the loss to BPD resulting from the purge overtime scheme during Carnes' tenure.  Probation has taken a narrower view.  Probation does not believe that loss occurring pursuant to this scheme on days that Carnes did not work a purge overtime shift can be attributed to him as "reasonably foreseeable."  In declining to attribute the remaining loss, Probation relates, "[t]here is insufficient evidence to hold the defendant accountable for loss that wasn't specifically known to him or reasonably foreseeable to him."  PSR, Objections, p. 30.  Instead, Probation believes that fraudulent overtime slips submitted by co-conspirators on days when Carnes worked, represent foreseeable loss (a figure of approximately $145,762).  PSR, Objections, p. 30.

The government believes that Probation has applied the "reasonably foreseeable" standard too restrictively in this matter.  Based on the facts, both the Guidelines and caselaw dictate a conclusion that the losses attributable to Carnes' co-conspirators during his time participating in the conspiracy represent jointly undertaken criminal activity, which was within

the scope of the agreed criminal activity, occurred in furtherance of that agreed criminal activity, and were reasonably foreseeable to Carnes.

As a starting point, this charge involves a conspiracy, the very definition of a jointly undertaken criminal activity, or, as the Guidelines provide, "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B). In the case of jointly undertaken activity, the court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a defendant." *United States v. Codarcea*, 505 F.3d 68, 72 (1st Cir. 2007); USSG §1B1.3(a)(1)(B). "This task requires the court to ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement. The court must then determine to what extent others' acts and omissions ... would have been foreseeable by a reasonable person in defendant's shoes at the time of his or her agreement." *Id*. See also, *United States v. Delima*, 886 F.3d 64, 73 (1st Cir. 2018).

With respect to the scope and objectives of the agreement, Carnes agreed to engage in a scheme with his co-conspirators to defraud the BPD utilizing fraudulent purge overtime submissions made during his tenure at the Evidence Warehouse, which lasted from at least July 2016 through February 2019. The conduct at issue, the submission of fraudulent overtime slips by co-conspirators during Carnes' tenure, "f[a]ll[]s within the scope of the specific conduct and objectives embraced by the defendant's agreement." *Cordaracea, supra*. The fraudulent overtime slips, whether submitted by Carnes, or, someone else, were submitted in furtherance of the conspiracy they all joined.

The members of the ECU, both supervisors and officers, were aware of the hours and frequency of the purge overtime shift (Mon.-Thurs., 4-8pm). Officers and supervisors

7

participating in this conspiracy were aware that they were consistently working two hours or less of those shifts, but lied about it. All of the participants were aware that everyone was leaving early. And this conduct occurred on hundreds of occasions, over years. This was one unit, working at one single location, engaged in the same scheme to steal money from the BPD by submitting fraudulent overtime slips for the 4-8pm purge overtime shift. Carnes' familiarity with the conspiracy's goals and methods are exactly the type of evidence that supports a finding of "reasonable foreseeability." As observed by the First Circuit, emphasis in original:

> foreseeability may be established … by a defendant's knowledge of *the nature and extent of a conspiracy in which he is involved*. … It is both good law and good logic that a defendant's awareness of the inner workings of a conspiracy in which he is participating is germane to, and often highly probative of, accomplice attribution. Although appellant may choose to characterize such intimate knowledge as "mere awareness"-a term that we view as verging on the oxymoronic in a case like this one-he is fishing in an empty stream. Such knowledge frequently will suffice to prove the defendant's ability to foresee the acts of coconspirators.

*United States v. LaCroix*, 28 F.3d 223, 229 (1st Cir. 1994) (emphasis in original). It was eminently foreseeable to Carnes that his co-conspirators, working exactly the same overtime purge shifts, at exactly the same location, often with exactly the same co-conspirators, would engage in exactly the same conduct that Carnes himself did with them, i.e., leaving early from the purge shift and collectively lying about it.

It is difficult for the government to believe that Carnes did not know, let alone that Carnes could not reasonably foresee, that his co-conspirators would do exactly what they did with Carnes and exactly what they all agreed to do with each other. Conversely, it makes little sense to the government to believe that Carnes, leaving purge shifts with his co-conspirators on Monday and Thursday on a given week at 6pm, could not foresee that those same co-conspirators would also leave at 6pm from the same overtime shift on Tuesday and Wednesday.

8

Especially so, when this conduct (and Carnes' own participation in it) occurred on hundreds of occasions, over years.

The evidence in this matter supports the inference that Carnes knew exactly what his co-conspirators were doing (even when he was not present). But that inference isn't even required to support a finding of loss. "Reasonable foreseeability is broader than knowledge." *United States v. Ford*, 73 F.4th 57, 66 (1st Cir. 2023).[4] In the drug context, the First Circuit has not hesitated to uphold attribution of narcotics sold at a location even where members of a conspiracy were not present on a given day. "It was <u>surely foreseeable</u> to Lugo that his coconspirators would continue to sell drugs at El Faro even on days when Lugo himself was not actively selling." *United States v. Walker-Couvertier*, 860 F.3d 1, 18–19 (1st Cir. 2017) (emphasis added). Just so, here.

In the view of the government, the fact that his co-conspirators would engage in exactly the same conduct Carnes agreed to engage in with them, *i.e.,* lying about working a full purge overtime shift, was entirely foreseeable – even on days Carnes, himself, did not work. *See Walker-Couvertier, supra.* Thus, this represents conduct: that was within the scope of the agreement Carnes entered into with his co-conspirators, USSG §1B1.3(a)(1)(B)(i); in furtherance of the conspiracy, USSG §1B1.3(a)(1)(B)(ii); and wholly foreseeable to Carnes, USSG

---

[4] Indeed, in the context of fraud schemes, the First Circuit has upheld a finding that conduct broader than that undertaken by a specific defendant can be foreseeable under Section 1B1.3. *See United States v. Iwuanyanwu*, 69 F.4th 17, 22 (1st Cir. 2023) (concluding that it was reasonably foreseeable to a defendant who used "fraudulent corporate documents to open bank accounts used to perpetrate … fraud" that other members of the conspiracy "could use false identities when opening additional bank accounts in furtherance of the conspiracy.")

§1B1.3(a)(1)(B)(iii). The entire loss to the BPD during his tenure from the fraudulent purge overtime submissions should be attributed to Carnes under USSG §1B1.3(a)(1)(B).[5]

B. Restitution

The government agrees that the amount of restitution to be paid by Carnes should be limited to the amount he personally obtained ($20,106).

II.     Government's Sentencing Recommendation

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; as well as for the reasons stated in the government's substantial assistance motion, dictate a sentence of one day deemed served, a three year term of supervised release, a fine within the Guideline sentencing range calculated by the Court (unless the Court finds that the Defendant is not able to pay a fine) and the payment of $20,106 in restitution to the Boston Police Department.

Undoubtedly, that this defendant, as a police officer, chose to break, rather than uphold, the law, is indefensible. But, a defendant's assistance to authorities in the investigation of criminal activities has long been recognized as a mitigating sentencing factor. The nature of the assistance provided by this defendant, including public testimony in a criminal trial, was exceptional. *See United States v. Torigian et al*, 20-10164-NMG [D. 387], Trial Transcript, p. 6-67. This defendant's cooperation was instrumental in bringing to light extensive corruption

---

[5] The specific figures supporting the government's estimate are detailed in <u>Exhibit 1</u>, hereto. The loss was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working.  *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65. Probation was provided with an unredacted copy. For public filing, the exhibit has been redacted to remove names of uncharged individuals.

10

within the Boston Police evidence warehouse, and, in assisting with bringing to justice those most responsible for the corruption.

The defendants personal and work history, more fully set out in the Defendant's memorandum makes clear that specific deterrence, the risk that Mr. Carnes may re-offend, is virtually non-existent. There is, similarly, no need to further protect the public such as might the case with a violent offender.

In light of the exceptional cooperation of this defendant, including that more fully detailed in the government's sealed Memorandum in support of a sentencing reduction under USSG §5K1.1, the government requests that the Court sentence the defendant to time served (one day) followed by three years of supervised release, a fine within the guidelines (unless the court finds he cannot pay), restitution of $20,106, and a $200 special assessment

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   /s/ Mark J. Grady
Mark J. Grady
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I hereby certify that this document will be served via ECF notice.

/s/ Mark J. Grady
Mark J. Grady
Assistant U.S. Attorney